Good morning, ladies and gentlemen. As you can see, Judge McEwen is appearing by video from San Diego. Can you hear us, Judge McEwen? Yes, I can. Thank you. Very good. We can hear you just fine. You may proceed. May it please the Court, my name is Gary Bachman, and I'm representing Petitioner, Puget Sound Energy, Inc. With your permission, I'd like to reserve three minutes of my ten minutes for rebuttal. The central point of Puget's decision is that the Commission is bound to follow its own rules, and in this case, it did not. Why do you care? Why do I care, Your Honor? I care because the Puget is aggrieved by virtue of the shift in remedy between price caps, which it sought, and now an exposure to refunds, which it's never sought, and which solely by virtue of the Commission's error, it now must carry that exposure, report that exposure on its financial reports, and bear the current costs of that exposure. Well, at least the possibility of refunds was acknowledged in your complaint. I mean, it could and has been argued that Puget put refunds on the table by making reference to the effective date. Actually, Your Honor, the complaint is required to put something in with regard to refund effect. I'm not saying you were seeking refunds, but the point is the possibility of refunds has been on the table since then. It actually stated in that section of the complaint that it didn't think refunds were appropriate, and that any refunds must take into account the prospective nature of the relief requested, i.e., refunds only after there were price caps and over the price caps. In your brief, you also acknowledged that the Commission reached the correct decision on the merits. Why would it put you in a legally aggrieved situation simply because you might have some exposure in terms of shareholder or other disclosure? It seems to me there's two separate issues and that you're mixing the two in terms of being aggrieved in a legal sense before this Court on appeal. I think we are aggrieved in the legal sense, Judge McCown, because there are current costs imposed on Puget and its customers by virtue of having to have that exposure, which exposure it should not have but for the Commission's error. It has no exposure when the remedy was price caps. It is only the Commission's error that's subjected it to that exposure and the burden, and I believe that does fit within the grounds of legal aggrievement. You said current costs. Aren't you talking about theoretical future costs? No, it's not just the cost of the litigation or the ultimate costs or burdens of the refunds. It's the cost to our financing by virtue of having the reserve for this. Do we have a reserve for this? We do not have a specific reserve for this. We have a reserve for the California crisis on our books that's quite substantial. Is any of this on the record? No, Your Honor. Why isn't Puget, if you think of this more akin to a civil lawsuit where somebody wins the law but if the case gets reversed, they wish the judge hadn't made a certain procedural decision, those parties are usually aligned with the appellees. Why wouldn't that be the case here? I think, again, the case here goes back to the very substantial shift in the remedies sought. Remember, this was Puget's complaint that sought price caps to protect its customers. And by virtue of that error, that shift in remedy to refunds placed its customers at exposure, and I think that's a significant difference. It's in some sense akin to NEPA cases where there were serious procedural errors that must be protected by virtue of the interests that those parties had in fair and correct procedures. But NEPA is a procedural statute in and of itself. And so in that case, the individuals that are challenging under NEPA actually were aggrieved by the environmental review process, which is part and parcel of the statute. It doesn't relate to the final N necessarily. But let me just shift a little bit. Why couldn't the commission in the exercise of its discretion simply deem these oppositions and motions as timely under its procedures? Well, the first answer to that, of course, is that it did not. Well, it first says they're untimely, but later says they're timely. So they do shift in their language of the order. There is in one of the orders where they claim they were timely. That's an error. They are clearly untimely. Timeliness is defined by another one of the commission's rules. It's not contained in our brief because no one asserted the petitions were ever timely. But Rule 210 and specifically 210B is quite explicit. It says only those filings made within the time prescribed in the notice will be considered timely. Rule 210, I have copies here if the court would like copies and counsel. But Rule 210B makes it clear that timely was driven by the notice of Puget's complaint, which was issued in November of 2000 and expired in, I think, November 16th of 2000. At least one of the parties had filed for intervention by then. I have to pause because I've lost track of the parties. But Gattle and the Washington Attorney General. And so the fact that there was somebody else who on a timely basis sought to stick a foot in the door, why can't the commission use that as a basis for proceeding? I'm sorry. If you mean timely with regard to the original intervention notice, none of the petitioners were timely in that fashion. The earliest of the petitioners. That was a November date they would have had to file a timely motion for intervention. That's correct. That was November 16th. None of the petitioners filed timely at that period. The two of the petitioners, Seattle and Washington Attorney General, which were the earliest of the interventions by any of the other petitioners, filed on July 9th, the very last day prior to when the withdrawal would have been effective. They filed for late intervention on that day and purported to oppose the withdrawal. Now, it's worth noting for a second and emphasizing that the only purpose for them opposing the withdrawal of the complaint and the rehearing would be to oppose the dismissal, to urge the commission to not dismiss the complaint. Because it had been dismissed for quite a while now. They did not have standing to raise that issue. The rehearing period on whether or not the complaint had been dismissed had run in December of that year. And that's the only purpose for which they could have conceivably filed the opposition to the withdrawal of the rehearing of the complaint. When did Puget file its request to withdraw its complaint? It filed the request to withdraw the complaint on 6-22, June 22nd. So how is it the preceding December was the last opportunity to intervene to object? I think I missed something here. No, I don't think you missed it. Well, I think you did miss something. In December, the commission dismissed Puget's complaint. In December 15th, the complaint was dismissed. Unlike the San Diego case, the complaint was dismissed. Rehearing of that dismissal was due by January 16th. But the commission was free to change its mind with regard to its own decision to dismiss. That's correct. The commission was free to change its mind. But the other petitioners had no standing on that issue nor on the issue of refund effective date because nobody challenged. Again, unlike the San Diego case, and you found this very relevant in the PUC decision, no one challenged the lack of a refund effective date at the time the complaint was dismissed. But isn't that water under the bridge once the complaint is reinstated and then later Puget asks to withdraw its complaint? That then kicks off another procedural process. But I think you have the process backwards, Your Honor. The complaint was never reinstated. It was withdrawn, and then that withdrawal became effective by operation of law. In fact, the complaint was never reinstated until the nanosecond, the nanosecond when they granted rehearing improperly long after this proceeding solely for the purpose of terminating. Puget's complaint remained dismissed for two and a half years but for that nanosecond. Well, it remained dismissed subject to further court order, correct? It remained dismissed for commission order. Except the commission did not issue an order tolling the withdrawal. And if the withdrawal was effective by operation of law, there was nothing left for the commission to reinstate. If not, if the contrary is true, then of course the commission's action is proper. And where does that leave you? Assuming hypothetically that we hold that your complaint was not withdrawn by operation of law, where does that leave you? It leaves us at that point in time with the commission going through its preliminary investigatory proceeding, which was a proceeding designed to determine whether or not to initiate an adjudication. And it declined to initiate adjudication, making review of that decision very much akin to the decision in PG&E versus FERC, which I believe the Ninth Circuit just issued in September. Thank you. Any further questions? Your time has expired. May it please the Court, my name is Kevin McEwen. I'm appearing this morning on behalf of the people of the State of California, and I'm also speaking for the other refund petitioners. My colleague, Mr. Heineke, and I are dividing our time equally. I'd like to reserve three minutes of my 15 minutes for rebuttal. I will address three points. This Court asked us to address the Dom-Tar case. I will address the Dom-Tar case. I'd also like to address the issue of reviewability of the order, and finally, the CSRS issue. I'd also like to just take a minute or so to briefly lay out what we see as the pertinent chronology in the case. This is an FPA Section 206 complaint case. The complaint put at issue all sales of energy into the Pacific Northwest wholesale power markets. The complaint also questioned the justness and reasonableness of rates in the Pacific Northwest. FERC dismissed the complaint, as we just discussed, and Puget sought rehearing of that dismissal. While rehearing was pending, Puget asked to withdraw the complaint. Note that Puget had to ask to withdraw the complaint because even though the complaint had been dismissed, it was still pending under FERC's rules, and Puget also sought rehearing of the dismissal. I mean, also sought to withdraw his rehearing request. Under FERC's procedural rules, Puget's withdrawal would have been effective if no opposition to the withdrawal had been filed within 15 days. But within 15 days, the City of Seattle and the Washington Attorney General filed motions to intervene and oppositions to the withdrawal. If those oppositions were valid, they prevented the withdrawal of the complaint by operation of law under the Commission's rule. FERC then issued the July 25, 2001 order in which it set for evidentiary hearing the issue of whether there should be refunds in the Pacific Northwest case. And then two years later, after the hearings, FERC issued its order on June 25, 2003, which is the order on appeal. And in that order, it granted Puget's request for rehearing and reinstated the complaint, thereby confirming that we were dealing with a live complaint all along. It also denied Puget's request to withdraw the complaint, necessarily, but then it granted Puget's relief on the merits. It excluded CSRS from eligibility for refunds, and it denied refunds to parties that the Commission might otherwise deem eligible on the grounds that even if rates were unjust and unreasonable, it would just be too inequitable to order refunds in this case. So my first point is the Domtar case. The issue in Domtar was the legality of FERC's decision to allow intervention in order to enable the filing of a rehearing request. What the intervenors wanted to do in that case was to file for rehearing from FERC's final order. It was the Domtar case calls it Ruling 3. And FERC had not granted at that time, at the time the ruling was issued, had not yet granted the petitioners or the intervenors petition to intervene. That was a big problem because under FPA 313, you may not file a request for rehearing unless you're already a party. It's a statutory jurisdictional requirement. So in granting the intervenors' rehearing request, this would have been in Domtar Ruling 4, the Commission also granted their intervention request retroactively to the Ruling 3, which they wanted to appeal. Domtar thus presented a statutory jurisdictional issue because of FPA 313. And that's the critical distinction between that case and this case. We don't have that here. In this case, the analog to Domtar's Ruling 3 is the June 25, 2003 order that we have on appeal here. Let me step back because as I understand Puget's argument, well, number one, under the Commission regs, a motion has to be, a motion can be made by a person who has made a timely motion to intervene. And if the motions to intervene were due in November and nobody made such a motion, the first motion made to oppose the withdrawal of the complaint is in July of 2001. So the question then is can those parties who made that motion, which I think were the AG and the City of Seattle, may they make a motion at that time because they have not previously timely moved to intervene? Yes, Your Honor. That would be a late filed intervention, which is what we did. And essentially what that means is we were taking the risk that FERC, in its discretion, could have denied our late filed intervention request. Let me stop you. If they grant your request to intervene, does that necessarily mean that you've made a timely motion to intervene? Not for purposes of... Are you saying it's retroactive? We would say not for purposes of Rule 212, which the Court also asked us to address. Rule 212 we view as a safe harbor. If you file a timely motion to intervene, which in this case would have had to happen in November of 2000, and then you file a motion even though FERC has not acted on your request to intervene, it's deemed proper. We don't have that here. We don't have that here. What we have is a late filed motion to intervene. It was filed on the same day that we filed the request to withdraw, and so technically FERC could have granted it on that day, and if FERC had granted it on that day, just like in Domtar, we would have been in the position where we could file the request to withdraw under the Commission's rules. As it turns out, though... But since they didn't grant it on that day, and they granted it down the road without saying it's retroactive, when is the intervention effective for purposes of filing a motion of opposition? Your Honor, FERC said that it was effective as of the day we filed it, and related back to the day we filed it, and we agree with that. But even if we didn't agree with that, and even if the Court didn't agree with that, FERC has permitted to waive its procedural rules, and there's good cause here. FERC found good cause, so there's no reason why FERC can't grant a late intervention. This is a housekeeping detail, and that's what happened here. This is not the situation in Domtar where it was a jurisdictional statutory question. These are FERC's procedural rules. My second point is reviewability. FERC argues for the first time on appeal that it was acting in an enforcement capacity here so that the Court can't review its decision. But this case was an adjudication based on a complaint, not an enforcement action. As this Court found in PUC FERC decided this past summer, and as Judge Thomas, you found in the PG&E case that was referred to earlier, there's a big difference between enforcement actions and adjudications. In this case, we have a proceeding initiated by a third-party complaint, not by FERC. In this case, we have parties who were permitted to intervene. That doesn't happen in enforcement actions. FERC ordered evidentiary hearings here on whether refunds should be granted, and it used Puget's complaint as the platform. Again, it was using a complaint. This is an adjudication. FERC itself said in the July 25th order initiating the hearing that refund issues are typically resolved through adjudications. And again, we have refunds at issue here. FERC ordered the ALJ to make findings of fact and recommendations just as FERC did with the ALJ in the California refund case. FERC reopened the record here to allow additional evidence, just as it did in the California refund case. And then FERC disposed of due process arguments that parties raised, not by saying this is an enforcement action, you don't even have due process rights. FERC could have said that if it believed that this was an enforcement action, but it didn't do that. Instead, it resolved the issues on the merits. So FERC knows how to convey to the parties and to the court that it's doing an enforcement action, but it didn't do that here. And it never explains in its brief how it is that this is an enforcement action. The law is that FERC can't pursue an adjudication course and then at the last minute protect its last step by claiming to act under its discretionary powers. That's the MCI case cited in our reply brief at page 4, footnote 6. And I'll note that it quotes the Minneapolis gas case, which is actually an even more on-point case. I understand the main thrust of your argument, but there is something a little different here in that it was FERC's action which expanded the proceeding beyond what Puget's filing sought. Indeed, we've already heard that Puget's filing sought this and suddenly it gets this and it's saying we shouldn't be stuck with all of this. Wasn't that expansion something? It was discretionary on the part of the Commission? It was discretionary on the part of the Commission, Your Honor. On the other hand, it was implicit in the complaint just like in the California refund complaint. In fact, in the California case, there wasn't even a mention of refunds in the complaint. And what this Court found was that because the complaint fairly put at issue the justness and reasonableness of rates, refunds were at issue. And that's exactly what happened in this case as well, only it's even more clear because, as you said, the complainant mentioned refunds and a refund effective date in its complaint. Well, in the California case, the Commission ordered remediation, ordered some refunds. It didn't do so here. Could that be argued to be discretionary? It looks to expand. Does this take a look at the side that's not going to proceed any further? Well, again, Judge Clifton, our point is when you go down the path, as FERC did here, and have all the trappings of an adjudication, and then at the last minute, actually not even at the last minute, on appeal, say the Court can't review our discretion here because what we really had here was an active discretion and an enforcement proceeding, not an adjudication. You have to look at what it really is and call it that. And what it is is an adjudication. Finally, I'd like to talk about CSRS. FERC's decision excluded CSRS's ability to get refunds here, actually excluded FERC CSRS from the proceeding altogether. And its decision to do so was wrong for three reasons. The first and primary reason is that CSRS purchases here fit precisely within the definition of the complaint. The record shows that 97% of the purchases that CSRS made that are claimed for refunds in this case, it made at Malin. Malin is in Oregon, in the Pacific Northwest, and within the definition of the Pacific Northwest as defined in the complaint. Well, the complaint uses the word into. Is that a word of art, into the Pacific Northwest market? I don't know whether it's a word of art, Your Honor. What I know is that in this case, sellers sold into the Pacific Northwest. Sellers who sold to CSRS sold into the Pacific Northwest at a point called Malin. And CSRS purchased the power there, and CSRS took delivery of it there, and under the WSPP agreement, CSRS took title and risk of loss there. And so CSRS had the power, and a transaction occurred in the Pacific Northwest in about 99% of the cases, 97% of which occurred at Malin. May I ask you on the SDG&E complaints in the California proceeding, they used the term sales into the California market, and CSRS was considered for refunds, and whether it was in or out of the various refunds in that proceeding. How does that jive with your argument here? Well, Your Honor, in the California refund proceeding, we took the position, this Court disagreed, we took the position that when CSRS purchased power on behalf of the ISO, it was standing in the shoes of the ISO, and therefore effectively was purchasing power for the ISO in the same way that the ISO would have been purchasing what it called OOM purchases. CSRS was doing it for the ISO, and what this Court found was that CSRS was actually engaged in bilateral transactions, and the sellers did not have notice that because CSRS was buying bilaterally, those sales might be subject to refund. And so the difference between that case and this case is that this Court excluded in the California refund case the CSRS transactions that we are, half of which we are claiming here, because they were bilateral. And so that's exactly the reason why they should be allowed here, because they are bilateral. If I understand the testimony you offer in this case, you segregated those transactions from the transactions that were at issue in the California proceeding, right? That's exactly right, Your Honor. And, in fact, we could have claimed and we could have attempted to claim CSRS purchases in the southwest or CSRS bilateral purchases in California. We didn't do that. We very carefully segregated those purchases that were made in the Pacific Northwest. I thought your position before FERC was the change of ownership occurred at the California-Oregon border, a fictitious point, not in the land. Your Honor, our position before FERC was that under the WSPP agreement, the title and risk of loss transfer at the delivery point. And when you look in the records, what you see is that Malin was the delivery point in 97% of the cases, and that was in Oregon in the Pacific Northwest. And then CSRS controlled whether the power was imported into California. CSRS has a risk of loss. If there had been a loss of some kind, it would have been on CSRS's head, not the seller's head. And so we think clearly these purchases were purchases into the Pacific Northwest, or sales into the Pacific Northwest by sellers, and purchases out of the Pacific Northwest by CSRS. Looking at the Puget complaint, you don't buy energy until January of 2000 is my recollection. Yes, Your Honor. The question is, does that matter because it is, was that contemplated by the Puget complaint, which was an earlier dated or earlier filed pleading? Your Honor, if I understand the question, it's because CSRS wasn't in existence at the time the complaint was filed? Correct. We don't think it makes a difference at all. The complaint notified sellers and focused on sellers into the market and notified them that their sales into the Pacific Northwest might be subject to refund. These are CSRS sales into the Pacific Northwest, and they are therefore subject to refund within the definition of the complaint. I'll point out that, you know, for example, CSRS didn't exist when the San Diego complaint was filed either. But CSRS is an entity. We noted that in the opinion, actually. Yes, Your Honor, but what didn't come out in that discussion, well, first of all, I would say that the critical issue, I think, in your discussion in that opinion was whether sellers had noticed. That was the whole idea. And at least as I read that paragraph in the opinion, sellers did not have notice because they were bilateral sales, not because CSRS was not in existence at the time. And what we have here is a different situation. Sellers had very much noticed that bilateral sales might be subject to refund. What I was also going to point out is that CSRS had the opportunity and is getting refunds as a market participant in the California refund case, even though it wasn't in existence at the time the San Diego complaint was filed. Because for the portion of CSRS's purchases where CSRS paid the bill, but the ISO was the purchasing party for awarding refunds because effectively the ISO was the purchaser of record for those sales. And so CSRS will get refunds in the San Diego case, even though it wasn't in existence at the time the complaint in San Diego was filed. So we just don't think that that is a distinguishing factor for purposes of whether CSRS should get refunds. I'll just conclude with saying that in the PUC FERC case, this court said that there were remedies for FERC and perhaps in other proceedings. Our view is this is the case. Thank you. Good morning. My name is Rex Heineke and I'm appearing here on behalf of the city of Seattle and the other refund practitioners, the city of Tacoma and the court of Seattle. I'd like to reserve five minutes of my time for rebuttal. As my colleague Mr. McEwen indicated, there are two things I want to talk about here. The first one is why was CSRS, why was FERC wrong in deciding that relief here, refunds were inequitable and second, why was FERC wrong when it said we couldn't obtain other sorts of relief? I'd like to start with the purpose of the Federal Power Act. As this court held in Lockyer, the primary purpose of the Federal Power Act is to protect consumers from unjust and unreasonable prices. It's FERC's duty to faithfully achieve that goal. But here, even though FERC assumed the prices involved were unjust and unreasonable, it nevertheless refused to give any relief at all. We submit that the only thing that is inequitable here is FERC's failure to perform its duty to protect consumers. We ask that this court reverse FERC, remand this to FERC and order FERC to do its duty and to protect consumers. Well, FERC's perspective is it is protecting consumers, but it's protecting them for the future because it believes that refunds would cause more harm than good. If that's factually true, and I don't want to phrase that at the moment, but if that's factually true, then why isn't that entirely consistent with the statute, that in fact they are protecting consumers, they're just more concerned about the future than the past? If it were true. Well, but that's okay. If your answer is, well, they could do that if it were true, that's a legitimate answer, but it means it focuses all the attention on the if it were true part. Yes, it does, but let me make a couple points here. First, FERC didn't think there was any sort of problem in the California proceeding with adverse consequences, so it could grant relief there. It's never explained why it's not granting relief in the Pacific Northwest, even though it has found that those markets are interrelated, and even though it, therefore, granted price caps in both markets at the same time. So it can't possibly believe what it's saying here, which is there's some adverse long-term consequence. Second, what... Isn't there a difference between price caps and refunds? In other words, there are different remedies for a market, a skewed market. Right, but my point is not that they're not different between price caps and refunds. My point is that the only way they could impose price caps in the Pacific Northwest is if they agree those markets are interrelated, and if they agree those markets are interrelated, then they should treat them in the same way. That's a part where I have trouble with your argument, because everyone agrees there's no dispute that the markets are interrelated. I think that is woven throughout the FERC orders. The question is simply because they're interrelated doesn't make them the same in terms of how they operated, one being a centralized market, the other, at least in this case, we're looking at bilateral transactions. So what I have trouble with with your argument, and maybe you can help me, is you seem to argue, well, because they are interrelated, therefore, you must have the same remedy. But it seems to me you're missing a step there, because interrelated doesn't mean that they operate the same. It just simply means that there is some relationship between what's going on. Yes, but I think what FERC must do and what it didn't do here is explain why, having found they were interrelated, that it would grant refunds in one of the markets but no refunds in the other market. It had a duty to give a reasoned explanation of that, and I don't believe it did so. So we can go to the merit, to the substance of it then, because that's really what it's coming down to, as to whether they did give reasons which you disagree with. The question is, were they legitimate and defensible reasons? And so it might be helpful to move on to those. Certainly, Your Honor. What we think FERC erred in doing was focusing only on the sellers. What FERC did not do was it did not focus on the purchasers, who were the people who were injured here. It only looked at one side of the equation and said, oh, there's going to be an adverse consequence possibly to sellers, and therefore we shouldn't do anything. We submit they've got it backwards. They should be looking at the ultimate impact on consumers, and that's something that they never did. They only talked about the adverse consequences that they thought existed for sellers. Well, I mean, Your Honor, I know what issue we're focusing on. I take it your comment here isn't focused specifically on the reasons given by the commission for treating the Pacific Northwest differently from California, which I understand they talked about in their November order. You seem to be speaking more generally, and it really goes back to the first question I asked, which is that FERC thinks that it is showing concern for the consumers because of its belief that granting the relief sought in the form of refunds would be more disruptive than beneficial. Now, you can quarrel with that factually, but again, we've got different strands of argument. We have arguments here that FERC doesn't have discretion. Right. And I think I keep hearing you say that, and then when you get to specifics, we always move away to something, but the facts don't justify it. So let me find out for sure. Are you making the argument now that FERC doesn't have discretion, period, or are we focusing on specific factual? Well, I think they have some discretion. What I'm saying is that they didn't properly exercise the discretion because they only focused on one end of the equation. That's what the mistake here is. So why is that arbitrary and capricious under agency review? I mean, if we're going to review an agency's focus, it seems to me we're really invading the province of the agency's discretion. Why is that an arbitrary and capricious decision? Because I think they have to give a reasons explanation for what they did, and I don't think they explained why they wouldn't protect consumers adequately. Also, I believe that their explanation here simply doesn't make any sense. What they really end up saying here is that people who FERC assumed were charging unjust and unreasonable prices, that those people, their investment expectations are somehow going to be damaged if they're not allowed to retain those unjust and unreasonable prices that they obtained. We don't believe they have any legitimate expectation in retaining something that is illegal. They have no lawful right to charge unreasonable and unreasonable prices. Well, I'm not sure where that argument comes from. Maybe you're referring to what they're talking about as the adverse market consequences, but I read that as downstream market consequences of what would happen, so-called future operation of the market. So my question is, how could we as a reviewing court, given the proceeding that went on, how can we challenge their view of a market operation? What would we have to do to say that it was arbitrary and capricious? Well, I think you have to go to the fundamental premise here, which is what I was talking about. Their fundamental premise is that somehow the market is upset if the law is enforced, and that people who it assumed charged unreasonable and unjustified prices are forced to turn that money back over. That, in our view, simply turns the Federal Power Act on its head because no longer- That assumes that the parties acting in the way that you described now as being unjust and unreasonable had reason to think at that time that what they were doing was subject to being unwound because it was unjust and unreasonable. And at that time, there were sellers that could have been lured into the market saying, well, heck, we'll manufacture, we'll sell more at that price. I mean, I remember buying stock that, in retrospect, seemed outrageously priced, but at the time, it seemed like a good idea. Well, at the time, it may have seemed like a good idea to the sellers to, okay, we'll generate this extra energy, we'll sell it at that price, it's worth our while. If you turn around five years later and say, well, that price, that wasn't fair in retrospect, so we're going to pull it back, does that make participants in the market hesitant in the future to come to the market if they're not sure the price being quoted is the price that's going to stay? Well, I think they always transact in that market, realizing that FERC has the authority, if it later finds prices to be unjust and unreasonable, to reset those. Is there any history of market pricing being found unjust and unreasonable? I think the expectation is that market produces just and reasonable prices. Now, we understand there's room for manipulation, and you certainly go after the manipulators, but what about the party who's not the manipulator? Well, maybe that's a justification as to some particular party exempting them from any remedy, but it's not a justification for saying we can't do anything in the Pacific Northwest at all in regards to any single transaction or any group of transactions. We just can't do anything at all whatsoever. Also, what FERC did here was it failed to consider the evidence of manipulation. It asked the parties to present it. We presented extensive evidence about market manipulation, and then it didn't consider that at all in its determination, so that it just left that off, didn't talk about it, and didn't deal with it. Surely it can't be the case that FERC can simply ignore that kind of evidence. Surely people who we believe engaged in intentional wrongdoing don't have any legitimate or reasonable expectation that they can retain the money that they got from unjust and unreasonable prices. That just, I submit, cannot be the law, and one of FERC's errors here was there was all sorts of evidence of that, and they simply wouldn't consider it whatsoever. So I don't know who, Your Honor, you invested in, and maybe they were perfectly innocent, but there were a lot of people here who were not innocent at all and knew what they were doing and knew they were gaming the market and knew that they were, in effect, stealing from consumers. How those people can have any reasonable expectation that they get to keep that money is beyond me. I'd like to reserve the rest of my time. Before you start, do you have a time allocation? Yes. Your Honor, the agency respondent intends on arguing for 22 minutes, and I intend to cede eight remaining minutes to the intervenors in support of respondent. May it please the Court, Robert Solomon, Counsel for the Intervenors. Turning to the last points first, the agency has undertaken to protect all market participants in this case, consumers and suppliers, and for the agency's efforts, we have petitioners who are both supplier petitioners and consumer petitioners. Again, turning to the last point concerning the ignoring of the evidence, I think it's important to emphasize right now that the commission, when it issued its June 25, 2003 order terminating, finally, the Puget complaint proceeding, also issued at that very same time, on that very same day, a bundle of other orders initiating investigative proceedings against suppliers, show cause proceedings, proceedings concerning the level of prices, a proceeding concerning manipulative, collusive practices of Enron, a proceeding to revoke the market-based rates of Enron, and a proceeding to condition all market-based rates tariffs to protect against any manipulative or anti-competitive behavior. However, what the agency said in the June 2003 order was that it did consider all evidence, but what the commission also did that day was to establish a number of show cause proceedings. In this manner, the commission does not have to worry about the timing of the Puget complaint, does not have to concern itself with whether a refund effective date was established or is effective, as we know from the 2004 Lockyer opinion, what we know from the 2006, the August opinion in the California PUC case, is that if there is a tariff violation, the commission does have remedial authority to go back in time whenever that violation may have occurred and to provide complete relief to those consumers who are the victims of manipulative behavior. What's important to keep in mind here... Is the commission doing anything along those lines? Yes, the commission has done plenty. The parties have been very vigorously involved in those cases. My understanding is that all of those cases, save one involving Enron, has settled. And considerable relief has been afforded to market participants both in California and the Pacific Northwest, and unfortunately there are numerous appeals queuing up in this court from the agency's actions in the enforcement cases. Of course, what we have... The question I have is whether, I appreciate that you've laid out the other actions, but that to some degree begs the question of whether the commission in the order being appealed from adequately addressed all sides of the equation, both the supplier and the consumers. Judge McEwen, I believe that the agency did discuss all sides of the issue and did act in the various rationales that it provided to protect consumers, suppliers, the market as a whole. Judge Clifton, you are correct. Some of the relief the agency provided is backwards looking. Some of the relief is forwards looking. With respect to rates, with respect to consumers, of course, let's not lose the fact that the agency did provide a price cap in June of 2001, and that price cap, perhaps belatedly, did satisfy the request for relief from the only complainant in this proceeding. Judge Clifton, I think you asked... Although that complainant is not exactly a consumer, so from the consumer perspective, I don't know that that's a very satisfying answer. Well, in the Pacific Northwest, just about everybody is both a buyer and a seller. I realize there are some exceptions. My understanding is that Puget both buys and sells, and that was the nature of the complaint that was filed in October 2000, which focused on the integratedness of the California and Pacific Northwest markets. Perhaps Puget thought that it was unfair that during some months it has to purchase power from California, but at other times has to sell into California at a capped price. Judge Clifton, you mentioned at the beginning of the argument whether the original complaint can be read to suggest the possibility of refunds. And yes, it would not be an irrational reading of the complaint, because there is a reference in paragraph 17 to the possibility of a refund effective date, but I suggest that the most reasonable interpretation, or even a reasonable interpretation of the complaint, is that the relief was prospective. Puget only mentioned the possibility of refunds and a refund effective date to the extent it was compelled to do so because of the strictures of Section 206 of the Federal Power Act. Let me stop you there. The commission issues prospective relief in the form of the rate cap in June 2001. That didn't end the proceedings, and indeed the commission had the ALJ proceeding a few months later. The commission opens the door to additional evidence being submitted. Lots of things happen. To say at the end of the day, well, the complaint only sought prospective relief, which we granted two years before, sort of invites what happened in the two years in between. Why all this activity if the commission wasn't considering something else? Well, Your Honor, I do agree. There was an opening of the door in the agency's July 2001 order. Of course, between December of 2000 and July of 2001, which of course is the period in question concerning the high rates, there was no proceeding. There was only a dismissed complaint. Puget had filed a request for rehearing of that dismissal, but all of the petitioners in this case had not intervened, had not opined on the complaint, and were remaining silent during the entire course of the Western energy crisis. Yes. Didn't FERC then at a later date, in looking at the intervention, say, well, it would really be unfair to these parties who were in effect on the coattails of the complaint, seeing what's happening, to not let them intervene. And so FERC itself basically expanded the proceeding to include the prospective interveners, didn't it? That is correct, Your Honor. And basically turned it into what can only be characterized as adjudicatory in terms of how it ran and the issues it was looking at. Well, I do agree that the agency expanded the proceeding, kept the proceeding alive, but I think it's important to keep in mind precisely what the agency did in July of 2001 in resurrecting the Puget complaint. This is found on page 131 of the joint excerpts. The agency established a fact-finding proceeding. The agency directed the parties in conjunction with the administrative law judge to develop a factual record. In July of 2001, frankly, the commission hadn't devoted much of its attention to the Pacific Northwest. The commission had devoted, and the parties had devoted, and the chief ALJ in the settlement proceeding had devoted most of the attention to California. So what the agency did in instituting this additional process was to merely ask the parties with the ALJ to develop facts  It's all based on the initial complaint. I mean, if you had stopped with the dismissal and then you said we aren't going to allow any more interveners, that's it. That would have been one thing. But when you reopened it, asked for factual findings, then you turned it into an adjudicated proceeding or continued the adjudicated proceeding, it seems to me. And however you fashion it, whether it's in your discretion or not, it seems to me that you're stuck with it, aren't you? Well, we are stuck with the proceeding that we established. For purposes of a proceeding, a proceeding is either defined by the complaint as presented to the agency by a third party or is defined by the agency itself. The interveners here, the petitioners, they're not second-class citizens. Of course, they are parties to the agency proceeding, but they take the proceeding as it has been defined by either the complaint or by the agency. The agency in July of 2001 did not establish a refund effective date, and I think that is a key distinction between this case and the California case. Section 206B of the Federal Power Act, which is 16 U.S.C. 824E, states that whenever the commission institutes a proceeding, the commission shall establish a refund effective date. I agree, Your Honors, there certainly are indicia of an adjudication because there is a proceeding before an administrative law judge. There is the taking of evidence. There is the submission of recommendations. But this is not the type of complaint proceeding or the type of proceeding instituted on the agency's own motion of the type that you typically see in a Section 206 case, which does have a refund effective date. But you allowed interveners. You took evidence. There were findings of fact and conclusions, and that doesn't occur generally when you're engaged in an enforcement proceeding. In fact, you've taken the position before this Court, and we've agreed with you that parties aren't allowed to intervene in enforcement proceedings. So tell me why you think that this proceeding is anything different from an adjudication. Something else. All I'm saying, Your Honor, is that there are indicia of both an adjudication and an investigatory proceeding. And, yes, you're absolutely correct. All of those points work in favor of categorizing this case as an adjudication. I'm stumbling with respect to... Well, there is no third category. It's something that's not an adjudication and not an enforcement proceeding, are you suggesting? Right. But I don't think we need to definitively label this additional process as either investigatory or adjudicatory. Why don't we? I mean, the parties have to rely on rules one way or the other. If it's an enforcement proceeding, there are certain rights and remedies that attach to that. And if it's adjudication, there are certain rights and remedies that attach to that. Why don't we have to declare it as one or the other? Because the agency's discretion that we have been talking about is twofold. One, to bring a new proceeding on its own instigation once the complaint proceeding has been fully satisfied. And two, with respect to Section 206B of the Federal Power Act, to provide for refunds. Refunds is discretionary. The agency submits that it took the action that it did here to settle the markets, to provide relief to consumers, and to do whatever was necessary to ensure that this type of crisis does not occur again. Well, let's move on from your indicia of both situations to the actual substance of the commission's ruling. What is your position in going through the various criteria? I think there were about five criteria that the commission addressed. If we were to disagree with some of those and find that reliance on those points was arbitrary and capricious, but not disagree with others, what's the agency's position on where that puts you on appeal? Assuming there's jurisdiction. Yes. The agency's position is that the findings, the rationale, would still be sufficient to support termination of this proceeding. Your Honor, the commission indicated that it was relying on the totality of the circumstances. The commission did look at various rationales, and I disagree fervently with the position stated of petitioners that the agency did not provide any rationale. Your Honor, I believe that some of the reasons perhaps are more freestanding than others. Which ones would you identify as freestanding in your nomenclature? In particular, the first one, which is the presence of governmental entities. As we know from last year's Bonneville decision, the agency has authority over public utilities, but not over instrumentalities of the state. As the ALJ found, there are differences between Pacific Northwest markets and California markets, and one of those differences is the much higher degree and percentage of governmental entities. Yes, I don't quite understand your argument on that, because basically you're saying if there are entities in the market to which we cannot grant relief, we can't grant relief to anybody, which does not seem to me reasonable. Well, the commission was focusing on the fact that most of the market participants are both buyers and sellers. It's not just simply a matter of providing relief to one party and not providing relief to another party, but that the relief would be inequitable as applied to that one particular party who might be able to receive refunds but not pay them. You would agree, I think, that FERC would have the authority to make those adjustments in individual cases. Yes, and in fact, that's one of the reasons why the commission preferred to consider evidence of market manipulation in individual cases involving the individual suppliers who may or may not be found to have engaged in market manipulation. With respect to the various rationales, I would like to point out that these are rationales that were also developed by the ALJ in the evidentiary proceeding. I believe the ALJ's findings are entitled to some deference, but I do need to clarify. The findings of the ALJ were made in September of 2001. Of course, Enron imploded a number of months later. 2002, early 2003 was spent investigating and deducing evidence of market manipulation. Obviously, the ALJ did not have that evidence before her when she made her recommendations. May I ask you about that? One of the challenges from the refund proponents is that they then submitted a number of documents related to the Enron that finally came out in various investigations, and that having done so, the only thing the commission said is we considered your submission, but didn't offer any verbiage in terms of how it considered it or what impact it had. Obviously, we can deduce that it didn't have any impact in changing its mind, but is that sufficient in light of what a cataclysmic event the Enron situation was? I think the explanation is sufficient when you take into account the other orders that issued the very same day. Your Honor is correct. There was not much verbiage concerning the market manipulation evidence. The commission did say that it considered that evidence, and the commission did say that there wasn't any evidence of lawlessness in the Pacific Northwest as opposed to California, and with respect to the ALJ's findings that markets during this time period were competitive, maybe those findings are entitled to less weight because the ALJ did not have this market manipulation evidence in front of her. Well, if the commission itself doesn't adopt those findings, if the commission won't say, as the ALJ appeared to say, that the rates were in fact just and reasonable, how is it we can give any deference to findings which the commission itself appeared not to adopt? Because the commission did explicitly adopt all of the other findings of the ALJ. I admit the ALJ's findings are weak with respect to market power and competition, but the various rationales that the agency did provide in the 2003 orders are precisely those rationales that the ALJ herself developed. Another one in particular, differentiating between California and the Pacific Northwest, is the fact that there were options available to Pacific Northwest customers in terms of hedging options that, frankly, were not available to customers in the ill-defined California markets as we now know. Why did I cut one way or another on the issue of market manipulation? I mean, the central question is whether or not FERC made adequate findings on market manipulation one way or the other that we can review, it seems to me. You didn't say anything about that. I think by your actions in not affirming that part, asking for more evidence on that question, by initiating other proceedings, FERC has basically impliedly said we do see evidence of market manipulation. But we don't have a factual record or finding on which to base any sort of review on that, do we, on this complaint? That is correct. And the Commission found for purposes of pursuing that evidence, it made sense to pursue that evidence not in the context of a dismissed, fully satisfied complaint with uncertain refund remedial authority, but rather in the contemporaneously instituted investigative proceedings which did allow for additional fact-finding and did allow for additional relief beyond the scope of this particular proceeding. And I could talk about the other issues, but I don't want to cut any more into the intervener's time. Judge Clifton has a question. We'll wind up giving people time, but the CSRS issue has been brought up, and I want you to speak specifically to that. And from this context, if we're speaking about purchases made within what's been defined as the Pacific Northwest market, in economic terms or in market analysis terms, does it make any difference that the power ultimately gets transported to California? Economically, it might not make any difference. This is a matter of construction of the complaint itself. Again, this is another matter that the ALJ decided, the ALJ decided, the Commission decided, and indeed the complainant itself has decided that the complaint was fully satisfied and the complaint contemplated sales into or in the Pacific Northwest, but that complaint did not contemplate sales in a southbound direction into California. How do you draw that distinction? Because I'm not sure that you said southbound. There was a factual finding allegedly that the sales occurred in California, but in looking at the record, to me it seems plainly wrong. It seems like it either occurred at Malin or it occurred or the change of ownership occurred at the California-Oregon border, and the record seems pretty plain on that unless you can point to something else I haven't seen, but I've looked at all the references. So why aren't those sales in the Pacific Northwest market? I agree. There are numerous record references to transactions being undertaken at the border, and in some sense a sale at the border is in the Pacific Northwest. So why in some sense can't you grant relief for those transactions? I mean, if you, on a blanket basis, you said no serious transactions are part of this complaint because they occurred in California, but we really know from the record that some of them did occur. In fact, most of them probably occurred that are the basis of the complaint as far as I can tell from the record. Right. Your Honor, I'm not suggesting that that would have been an unreasonable interpretation. All I'm suggesting is that the interpretation of the ALJ and the commission is a reasonable interpretation. The complaint or interpretation of what? It appears based on a faulty factual finding. An interpretation of the complaint. Well, the complaint says, and you'd agree, that the sale is in the Pacific Northwest. That's covered by the complaint, right? Yes. Now, we know that some of the serious transactions occurred in the Pacific Northwest, right? At the border. Or before the border. We know that there are some – we know the change of ownership of lease was at the border. Some of the delivery points may have been made more, but I think most of them probably occurred at mainland, which is on the Oregon side. Why isn't that enough to send that back for reexamination? Because the complaint also makes reference to the word into. Yes, there are references to in, but there are references to into, and the complaint specifically defines the Pacific Northwest by reference to the Pacific Northwest Power Planning and Conservation Act at 16 U.S.C. Section 839A14. This is a footnote on the second page of its complaint. The reference to that statute refers to Oregon, Washington, Idaho, and portions of other states, but not portions of California, and I submit that the ALJ was correct that the reference to into does suggest not just the actual location of a particular transaction, but also the movement and the direction of that transaction. All right. Thank you very much. Thank you. Why don't you put – would you put eight minutes back on the clock so that Mr. Frederick can have an accurate count? Before we start, I made an error in my opinion, and as your client, I appreciate you calling it to my attention. It was an important factual error, and I apologize for that. So I'm glad we could rectify it. Thank you very much, Your Honor. That's very gracious of you to say here in an open court. I'd like to first address the merits because it's important that the court understand that the purpose behind the Puget complaint was to ensure that the price caps that had been instituted in the California market would not cause a skewing into the Pacific Northwest market. And so the whole idea of the Puget complaint was to protect consumers in the Pacific Northwest who might be adversely affected by there being price caps for southbound transactions, but not for northbound transactions. And as a result, when the ALJ found that the transactions for CSRS were – the delivery was physically taken in California, and that was the ALJ's finding of facts number 28, which is the joint record of 341. That seems a little discreditable to me from the record, though. Can you point to anything else? We have the – it's consumed in California. There's no doubt about that. But in reviewing that critical portion, I just didn't find any support for it. Well, I think that there is evidentiary support, which I can't cite to you here. It is not in the JER. It may well be in the other appendix, which I don't have the citations for here. But the important point is the purpose behind the Puget complaint, which was to protect consumers in the Pacific Northwest. And the state commissions in Washington and Oregon specifically asked for – to reject the request for refunds by Seattle and Tacoma and others Because of the 226 participants in the WSPP, only a handful came forward asking for refunds. And the reason for that was that all of the other sellers and purchasers in the Pacific Northwest had protected their consumers by expending money to engage in long-term or medium-term hedging instruments. And the state commissions in Washington and Oregon charged to protecting consumers specifically told FERC it wouldn't be fair to consumers to reward those entities like Seattle and Tacoma that had not protected their consumers by engaging in the kind of hedging instruments for long- and medium-term contracts that other purchasers had had. So it is simply false for the other side to say that the commission did not take the interest of consumers into account. The commission did, as did the state commissions in Washington and Oregon, whose views here are entitled to respect. Let me ask you there, I mean it's sort of like saying that they purchased this defective product, which was unjust and unreasonable, but we're not going to give them any relief because they didn't have the foresight to purchase the product next door, which turned out not to be unjust and unreasonable. But the fact is what they did purchase at least is assumed for purposes of this proceeding to be unjust and unreasonable. Why does that hurt other consumers to give them relief? Because the effect of the multiple transactions that the commission found there to be each unit of energy being transmitted back and forth six times before its ultimate consumption and in excess of a half a million specific transactions that were at issue here, what the ALJ and the commission determined was that at some point in that chain, a governmental entity could not be ordered to pay refunds. And what you have here, Judge McKeown, is Seattle and Tacoma, who are also selling this same energy under the Bonneville decision, they would not have to pay refunds, but they would be ordered to receive refunds. Well, the order could say you can't collect on a gross basis. You have to collect only on a net basis. Well, what the commission in its discretion, and it does have discretion under Section 206 of the Federal Power Act, determined that it would be inequitable for that reason to try to parse through all of these different layers because those particular entities could not be ordered to pay refunds, but yet were asking to receive them. And the state commissions also determined that that would create a destabilizing effect for the marketplace, which would be unfair and inequitable for consumers. Because after all, if you're not in a utility district that is one of the petitioners here, you've paid extra in order to hedge your bets. And Bonneville in 1999, before all of this ever took place, warned these specific entities that market conditions are going to be volatile because of weather conditions that are drawing down the hydroelectric capacity, which comprises 60% of the Pacific Northwest market. Was that one of the reasons, that was one of the specific reasons FERC gave for distinguishing the market? Was the Northwest reliance on hydropower? That's correct. That's correct. The commission did make that distinction, and as did the state commissions. And so when you think about the equities involved, what the commission was attempting to do was to come to a rational result where only a handful of entities that had sat on their hands, that had placed over-reliance on the spot markets, while adjoining utilities had paid extra money to engage in long and medium-term contracts that protected against the very risks that Bonneville had warned them about. The commission, in its discretion, quite properly found it would be unfair and inequitable to order refunds in that circumstance. If you assume for the moment, on one level this argument says, look, drought conditions, as the ALJ found, the market operated properly, it was not unfair, not unjust, not unreasonable. But the commission chooses not to adopt that conclusion, and says even if it is unjust and unreasonable, we're not going to order relief. And at that point I have some difficulty, because if you say there is gouging going on, I'm not sure it's a very satisfactory answer to say, but we're going to disregard it because some people got gouged more than others. Well, the statute itself answers the question, Judge Clifton, because it says that if the commission, after having determined that there were unjust and unreasonable rates, may order refunds, and the Towns of Concord case from the D.C. Circuit makes emphatically clear that that is a question within the commission's discretion. But it isn't a discretion that could be exercised arbitrarily and capriciously. If the commission says we're going to flip a coin, heads we refund, tails we don't. That would be arbitrary and capricious, but that is not what the commission did here. The commission engaged in an expedited investigation of lots and lots of witnesses on a very truncated basis, a basis that I might add our clients and others thought was unfairly grafted in its effort to get fact-finding. But at the end of the day, what the commission determined was that it couldn't equitably award refunds given the rippling effects of transactions, the presence of governmental entities. Bonneville, after all, consists of 40% of the sales in this market. And so at the end of the day, what the commission determined after amassing a great deal of investigatory evidence was that regardless of any findings about particular transactions that might be unjust and reasonable, it would be unfair and inequitable to award refunds. And I think it's important to distinguish, actually questions that Judge Clifton, you and Judge McKeon asked earlier, the central clearing market mechanism in the California process makes that completely distinguishable from the bilateral transactions done at arm's length in the Pacific Northwest. Whereas one person or one entity might cause a change in the market clearing price in the CAISO and in the CalPX, that couldn't happen with respect to arm's length bilateral transactions. Thank you. Thank you. Mr. Bachman? I'm sorry. Even for the last one, I thought you had... How much time would you like? Your Honor, I have two minutes. All right, very good. May it please the Court, I'm Lillian Harris, representing the refund claimant intervenors that support FERC. We do support them on discrete issues. I wish to briefly address the refund effective date raised by the Puget intervenors in this case. And specifically, I'd like to address the waiver argument. This Court lacks jurisdiction to consider the refund effective argument raised by the Puget intervenors because we failed to raise it before FERC initially. 313 of the Federal Power Act requires them to raise the issue at that level before it brings it to this Court for review. Puget intervenors failed to do so and therefore it's not before you presently. The two issues that were involved here, the new claim that is raised on appeal is distinctly different from the claim that was raised before FERC in the single joint intervention that was brought to FERC's attention after the June 23, 2003 order. The issue that they raised there was the issue of when the refund effective date should be, whether it should be December 25th of 2000 or some other date. They did not raise the issue of whether the Federal Power Act statutorily requires FERC to establish or go about setting the refund effective date at a certain time. That is the issue that is raised here. It is Hornbook law that you cannot raise new issues for the very first time on appeal. They're very distinct issues. We would simply submit to the Court that the refund effective date argument that has been raised newly here is not before you because it has not been preserved for appellate review. Thank you. Do you want to take that point first? Yes, I would. Actually, let me take that second because first I have to correct a misunderstanding by Judge Clifton. Treat of Sound Energy, Inc. is a traditional integrated utility. Its interests throughout this proceeding have only been its interest of its customers. It is not a seller in any context other than as a utility protecting the interests of its customers. It's one of the unique characteristics of this case that is completely different than the California case, which is consumers are on all sides of every transaction. Almost all of the transactions, all of the selling transactions, are from one consumer utility to another consumer utility. And so there is no seller versus consumers distinction in this case. I'm going to take a moment of your time. I just want to make sure I understand this. First of all, are you saying it is a consumer-owned company? It's not a consumer-owned company. It's an investor-owned utility. But all of its actions in the marketplace are solely on behalf of its utility customers. It has no other business. I don't want to debate whose interests are being looked after, but I'm still confused because is it not a seller of energy in this market, not only to its customers but to other utilities? Yes, of course it is. And every utility that is a prudently run utility will at times be forced to make sales because they are forced to plan for the future and ensure that they have reserves, that they have more than they need if demand spikes higher than it. So every utility is selling. That is power that was bought on behalf of its customers. And the sale price goes back to its customers. Any part of the rationale for the complaint in the first place, as I understand it was described, is that you're selling during certain times of the year to California and buying at other times of the year from California. You didn't want to be whipsawed by price caps applied to only one. That's exactly correct because it would be our consumers that would be whipsawed by those differences. Then to the point under 313, I agree with the statements on the law, but it's applied to the wrong point. The point at which the refund effective date was not raised and thus is preclusive is the point in November and December when nobody raised it, when the commission dismissed the complaint and nobody challenged anything but Puget and the CEOB seeking price caps. The refund effective date was not raised at that time. That's the critical period at which 313 would make that a preclusive issue. Lastly, there's misstatement with regard to our complaint. We did not ever question the justice and reasonableness of any rates. Indeed, the gravamen of our complaint was that there would be undue discrimination with regard to a situation where price caps were protecting consumers in California and no price caps were protecting consumers in the Pacific Northwest. It's completely different than the gravamen of the San Diego complaint which dealt with unjust and unreasonable rates. Ours was focused upon the other part of Section 206, which is the undue discrimination of that action. Roberts. Thank you, counsel. Mr. McKeown. Mr. Heilman, are you going to take your time? I've got 300 on me. Thank you, Your Honor. Mr. McKeown has ceded whatever time he had left to me. I'd like to respond first to this question about the spot markets and the argument that somehow Seattle and the other petitioners didn't protect themselves. The fact of the matter is there's nothing in the Federal Power Commission that says that people who participate in the spot market aren't entitled to protection by FERC. You can't simply cut out one market and say, well, if you're over here in this market, we're not going to do anything to protect you. Let me try this. If FERC has discretion with regard to remedy, would it be inherently arbitrary for a commission to say, if we look at the market, if we do things that are going to encourage people to participate in the spot market and rely on the spot market rather than on longer-term contracts, that's disruptive. We don't want to encourage that, so we don't want to go down a road that may lead to refunds to people that didn't store their nuts for the winter or built a household straw. We just think it's a good thing we're going to encourage, not do anything to offer motivation for people to go to the spot market. So is that a basis FERC could use to say, look, we're not going to offer this relief because it would benefit those who participate in the spot markets more. I guess the problem is it's not true. Seattle had 99 percent of its purchases not in the spot market. These were not people who simply said, oh, we're going to dump everything in the spot market, run the risk. Everybody had some needs that had to be done in the spot market, but they weren't just putting, as you said, Your Honor, all their nuts in one basket over here and running the risk and then saying, ooh, we ran the risk, FERC, come and save us from the risk that we took. In any event, when they were doing things in the spot market, they were entitled to be protected in that market like any other market. There's also this definitional problem here, of course, what's the spot market and the long-term market. In addition, Your Honor, I think this falls right within what Commissioner McEwen, I'm sorry, Commissioner Massey said when he dissented. He said that FERC has refused relief in the non-spot market, and so you're damned if you do and damned if you don't under FERC's view. You can't get relief in the long-term market. You can't get relief in the spot market. You don't get any relief as far as FERC is concerned. This Court recently reversed that as the long-term market said you're entitled to protection there. We believe that we're entitled to protection when we do transactions in the spot market also. Let me turn back to one of Judge McEwen's questions, which mirrored one of mine. FERC gave, I believe, five independent reasons. Do you think they're independent and freestanding? No. I think if the Court is reversing some of the reasons, then this must go back to FERC to reconsider it because several of the underpinnings for its decision have gone before us. It said we considered the totality of the circumstances. It did not say we find rationale number two by itself is adequate. What it said was if you take every one of these and you add them all up and you look at the totality, that justifies our decision. If you now knock out a couple of those rationales, that totality no longer exists, and FERC never found that any one of its rationales by itself was adequate to justify what it did. In addition, not only are its rationales inadequate, but I really want to emphasize the point of what FERC didn't look at. The parties here submitted 140,000 pages of exhibits and 270 pages of testimony on manipulation, and FERC gave that not one whit of attention. The parties demonstrated the terrible damage that they were suffering, that Seattle Airport in one day spent its entire energy budget. I think what FERC says is that we attended to that, or we are attending to that, but not through this vehicle, but by starting separate enforcement actions. Is that something FERC's entitled to do? I think there are two problems with that. One, those enforcement actions do not cover by any means everything that the petitioners are objecting to here. They are far more limited. They are not an adequate substitute because they don't cover all the proceedings that we are unhappy about, all the transactions, I should have said, that we are complaining about. They simply aren't an adequate substitute. I also think that this court answered that question in the PUC case in August when it said on page 1051, and I quote, When Section 309 relief is sought, parties have a right to a market-wide ruling, unquote. That's exactly what we're asking for and what FERC is refusing to give us. They're saying, oh, we'll go over here and we'll pursue a couple individual enforcement actions that are far narrower than what you're complaining about, and you should be satisfied with that. I don't believe... Let me ask you, counsel, a question on that. We're kind of in a difficult situation as an appeals court because FERC let the proceeding be reopened for the submission of all the in-run documents. We don't have those in-run documents, I don't think, in what's been submitted to us. We have indices. So all we really have is parties' argument about what they say. FERC says, okay, we looked at those. We let you reopen. We read them or we considered them, and we've put that in here. But we still come out with the same rationale. On what basis would we have to, as a court of appeals, to overturn that integration into their finding as arbitrary and capricious? Well, there are two things. I think if you read their decision closely, you'll see that they talk about relying on the preliminary evidentiary record. That does not include the materials I'm talking about. That is, they had an initial record, then said to everybody, well, go and get all this other evidence, and we got it. But if you look at their decision, they say they're relying on the earlier record. In addition, if you look at their decision, they never explain why the manipulation evidence, why the damage to consumer's evidence is not relevant to this equitable weighing process. They must give a reasoned decision as to why none of that evidence should be considered here, and their only explanation is to say, well, we're going to go off and pursue some individual enforcement actions. That is not an adequate answer when we're asking for a market-wide relief, a market-wide ruling. They're not doing that. They're simply saying we're not going to do that. We won't do anything for you.  Thank you very much. Thank you. The case is certainly submitted. I want to thank all of you for your briefing and your arguments today. All have been very helpful to us, and it's very well done. And we will be in review. Thank you.
judges: Thomas, McKeown, Clifton